Thomas Carr *et al. vs.* Bertha C. Railton, *Admx.*
*c.t.a. et al.*

MARCH 6, 1941.

Reargument Denied May 2, 1941.

Present: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

226

Moss, J. This is a probate appeal from a decree of the probate court of the city of Pawtucket, entered on November 30, 1938, in the matter of the estate of George Albert Carr, late of Blackpool, England, who died there, testate, on November 20, 1935. His will was duly admitted to probate by the English court having jurisdiction, and his first cousin Mary Agnes Almond was duly appointed by that court as sole executrix of his will.

The appellants are the sole heirs at law and next of kin of the testator, according to the laws both of this country and of England. The first appellee is the administratrix, with the above will annexed, of his estate in Rhode Island, duly appointed as such administratrix by the above-named court of probate, upon the petition of Mary Agnes Almond, executrix as above stated. The assets of this estate in Rhode Island consisted of two savings bank accounts. The other appellees are Mary Agnes Almond and her two sisters, Clara Almond and Hannah Almond, all of Blackpool, England, these three being the sole surviving legatees under the above will.

The appellants, describing themselves as such heirs and next of kin of the decedent, filed in the probate court of Pawtucket, in the matter of this estate, a petition in which they set forth in full the disposing part of the will above mentioned, as follows: "I give and bequeath unto William Henry Bond of 21 Rhyl Street Fleetwood the sum of twenty pounds. All the remainder of my personal effects including all money on deposit in Banks in England to be devided equally between my three cousins

| 8 Watsons Road | (Hannah Almond |
| Blackpool | (Mary Agnes Almond |
| Lancashire | (Clara Almond " |

They stated also in this petition that the testator "left money on deposits in America in the City of Pawtucket, State of Rhode Island, as follows: "describing two accounts, one for $12,496.91 in the Industrial Trust Company, Slater Branch, and the other for $4086.40 in Rhode Island Hospital Trust Company, Pawtucket Branch.

They further stated in this petition that the following questions arose: (1) What is the proper construction of the legacies set forth in the will? (2) Are the legacies or either of them as set forth in the will sufficient to indicate an intent on the part of the testator to devise the funds in America to the legatees named therein? (3) Is the testator intestate as to the monies on deposit in America? (4) Who are the next of kin of George Albert Carr?

There is no dispute as to the proper answer to the last question and it will not be discussed. The others really constitute one question, which is whether, under the proper construction of the concluding legacy in the will, the testator bequeathed the bank accounts in Pawtucket.

The appellees filed in the probate court motions that the above petition of the appellants be dismissed on certain grounds, of which the ones now insisted upon were substantially that the probate court had no jurisdiction to construe

the will, by determining whether or not the testator died intestate as to any part of his estate; that the petitioners were barred by laches, two years having elapsed since the will was recorded in this probate court before any question was raised as to its construction, and most of the assets here having meantime been sent by Bertha C. Railton to the executrix in England; and that the petitioners were estopped to file the petition, because on May 21, 1937 they had filed claims against the estate as creditors and about six months later had filed in the superior court of this state a bill in equity against the aforesaid Bertha C. Railton, both individually and as administratrix, to impress a trust upon the funds now in question.

By a decree of the probate court, which was entered on November 30, 1938, and in which no reasons were stated, these motions were granted and the petition of the next of kin of the testator was denied and dismissed "without prejudice". This is the decree which was mentioned at the beginning of this opinion and from which the next of kin of the testator took an appeal to the superior court.

When the case reached that court, the appellees filed there a motion that the appellants' claim of appeal be dismissed, on the grounds that no notice of it had been served upon the appellees; that the superior court had no jurisdiction over the subject-matter; and that the appellants had no interest in the will or the estate of the decedent and therefore were not parties aggrieved. After a hearing in the superior court this motion was denied. No exception to this decision was taken by the appellees.

Thereupon the appellees entered their general appearances in the superior court and thus waived the first of the above grounds. A little later they filed a new motion to dismiss the claim of appeal, the grounds which were stated therein for such dismissal, and which are still relied upon, being substantially the same grounds as those which are above stated

as the appellees' grounds for their motion in the probate court to dismiss the appellants' petition.

This motion to dismiss the appeal was heard before a justice of the superior court and was denied by him on the ground that a similar motion had previously been denied by another justice of that court, as above stated. An exception was taken by the appellees to this decision.

The case was later tried on its merits before a third justice of the superior court and a jury. A similar motion to dismiss was made in behalf of the appellees and denied, and an exception was taken to that ruling. At the conclusion of the presentation of evidence on both sides, it was agreed by the attorneys for the respective parties that the jury should be discharged and that the case be decided by the trial justice after the arguments had been concluded.

The case was then fully argued by the counsel, and many legal authorities were cited for each side. The trial justice then, from the bench, decided that he had jurisdiction of the case, and also, in substance and effect, decided that the testator intended his English property to go to his English cousins and his American property to go to his American relatives; and the trial justice further decided that the testator died intestate as to his money in America.

To the first and third of these decisions the appellees took exceptions. They also took an exception to the decision of the trial justice in sustaining the appeal of the appellants from the decree of the probate court. The case is now before us on the appellees' bill of exceptions, in which six exceptions are set forth.

The first of these is to the decision by the second justice of the superior court in denying a motion by the appellees to dismiss, on the ground of want of jurisdiction by the court over the subject-matter, the appeal taken by the appellants from the above-mentioned decree of the probate court en-

tered on November 30, 1938. This decision by the second justice was based on the ground that the same question, of the jurisdiction of the court over the subject-matter, had been raised by the first motion to dismiss made in the superior court by the appellees and had been decided against them in a decision by the justice who heard that motion. The ruling of the second justice was that the matter was *res judicata* for the superior court.

In support of this ruling the appellants have relied, before us, on the opinion of this court in *Colaluca* v. *Firstenberg Bottlers' Supplies, Inc.,* 65 R. I. 39, 13 A. 2d. 378, in which the motion then in question was based on the lack of jurisdiction in the superior court over the *defendants,* not over the subject-matter; and we held that the same question could not be again raised in the same court.

The appellants contend that the same doctrine as to *res judicata* applies to the raising again, in the same court after a ruling thereon, of the question of jurisdiction over the *subject-matter;* that under that doctrine the above ruling of the second justice of the superior court was correct; and that the appellees' first exception should be overruled for that reason. This contention becomes immaterial, if we come to the conclusion that the probate court had jurisdiction to decide, upon their merits, the questions propounded in the appellants' petition. We therefore deem it proper and advisable to decide first this question as to the jurisdiction of the probate court.

The language of general laws 1923, chapter 369, sec. 15, now G. L. 1938, chap. 579, § 15, is as follows: "Whenever any question arises as to the identity of a legatee, or the construction or the payment and satisfaction of any legacy, the probate court, upon petition setting out such questions, after notice by citation to all known parties and any additional notice the court may direct, and after hearing thereon, may determine the same and enter its order accordingly."

This provision was first enacted in the Court and Practice Act, taking effect July 17, 1905, and has been in effect ever since, being included in each successive revision of the general laws.

In *Thompson* v. *Clarke*, 46 R. I. 307, 127 A. 569, this court reversed a certain decree of a probate court by which was granted a petition, by the residuary legatee under a will, that the administrator *c.t.a.* be directed to file a statement setting out the names of the legatees and the amount to be paid to each of them. In doing so, it said that if the residuary legatee desired to have heard and determined by the probate court any questions relating to the identity of a legatee, or the construction or the payment or satisfaction of any legacy in the will, she must proceed under a certain section of the statutes then in force, which was identical with the above-quoted section of the general laws of 1923. It stated that prior to the taking effect of the Court and Practice Act, July 17, 1905, probate courts had no jurisdiction to pass upon such questions; but that express authority to hear and determine such questions was conferred upon probate courts by the section above quoted.

This section, when first enacted, purported to confer upon probate courts a new power, exercisable upon a petition filed by a proper party, to determine certain questions as to any legacy, including the construction of the language of such legacy; and the probate court in the instant case did not deny the appellants' petition in the exercise of any *discretion* to grant or refuse the relief sought therein, but apparently because it held that it had no *jurisdiction* to grant it.

In 1905 the commission, composed of a retired chief justice of this court and six prominent lawyers, which had been appointed by the general assembly of this state for that purpose, presented to the general assembly, with recommendations of passage, the draft of what became the Court and Practice Act. In the report which accompanied that draft,

the commission, at page viii, said: "Before the amendment of the Constitution chancery powers could not be conferred upon any other than the Supreme Court to any greater extent than was provided at the adoption of the Constitution, and consequently all questions which involved the construction of wills have had to go to the Supreme Court by separate proceedings. Not only has this caused unnecessary delay and expense, but there has been a growing feeling that the probate system itself is inadequate."

At page ix the commission said: "The changes made in the probate law have been chiefly in the line of a more expeditious, complete, and convenient system. They have been made after consultation with experienced probate officers. The subjects have been grouped in an orderly way, under sub-titles, so as to be more easy of reference. The system proposed empowers Probate Courts to construe wills so far as may be necessary to advise executors and administrators with the will annexed with respect to the payment of legacies. This provision enables executors to close their accounts in the Probate Court, and the law further provides for the discharge of executors and administrators so as to terminate their liability. Under the existing law no provision is made for allowing an executor's account and effecting his discharge. The demand for these provisions is general on the part of the bar of the State and persons who become liable upon bonds."

At page 389 of the accompanying draft of the Court and Practice Act, we find sec. 980. This is identical with the corresponding section of the act, as enacted into law in 1905, and with G. L. 1909, chap. 318, sec. 15, and with G. L. 1923, chap. 369, sec. 15, hereinbefore cited and quoted.

We are of the opinion that the extracts above quoted from the report of the commission strongly support the conclusion that the general assembly, in enacting the Court and Practice Act, clearly intended to vest and did vest in the probate

courts of this state a new power and jurisdiction to determine certain strictly limited kinds of questions presented to them as to legacies, including the construction of the language thereof. We find, in the act, nothing else that is inconsistent with this interpretation. After considering the relevant parts of this report and the provisions of the act itself which throw any light upon the section now in question and considering the opinion of this court in *Thompson* v. *Clarke, supra,* we are convinced that the conclusion above stated is correct.

The new power and jurisdiction is strictly limited in its subject-matter, as above stated, and also by the fact that it is exercisable only as to a legacy in a will then before the court in the course of the administration of the estate of the testator, and the question or questions to be determined must have arisen in the course of such administration.

So limited, the jurisdiction thus conferred upon the probate courts differs radically from the general jurisdiction of this supreme court as to the construction of wills, a jurisdiction which any person having a substantial interest in the construction of a will may invoke at any time by filing, in the superior court, a bill in equity for the construction of such will. Such bill, when the cause is ready for hearing for final decree, will be certified to this court for determination under G. L. 1938, chap. 545, § 7. We see no inconsistency between the two kinds of jurisdiction.

On this question of the jurisdiction of probate courts, the appellees seem to rely to some extent upon language in the opinion of this court in *Rhode Island Hospital Trust Co.* v. *Hodgkin,* 48 R. I. 459, 137 A. 381. That language was used with regard to an authorization which had been given in a probate court of this state, under a very different statutory provision, and which involved the property rights of a very young infant. We have carefully considered that language and are of the opinion that it is not at all inconsistent with

the conclusion which we have reached as to the very limited jurisdiction conferred upon probate courts by the statutory provision involved in the instant case.

In the instant case it is vigorously contended, in behalf of the appellee, that the general assembly could not have intended to vest *any* power as to the construction of *any* part of a will in probate courts, many of which are composed of men not learned in the law. But many of the questions, which, in the course of the administration of estates, arise as to the construction of the language of legacies, are simple or relatively so, the amount involved may be small, and frequently the main *desideratum* is to get such questions settled promptly and inexpensively.

Then, if any party aggrieved by the decree of the probate court wishes to do so, he may take an appeal to the superior court, where the matter may be tried *de novo;* and any party aggrieved by the result in that court may have the case reviewed in this court, as other probate appeal cases may be reviewed, on a bill of exceptions.

Taking these matters into consideration, we are of the opinion that there is no merit in the appellees' contention that many of the probate courts of this state were, at the time of the enactment of the Court and Practice Act, and still are, composed of men not learned in the law and that therefore we should not give to the language of the statutory section now in question the interpretation which we have above given to it.

The appellees seem to argue also that this section does not authorize a probate court to construe an *entire will;* and that this is substantially what this probate court was asked to do by the appellants in the instant case. But here the appellants petitioned for the construction of only *one* legacy, to be divided equally among three persons, and that was all that was construed by the superior court. Surely the fact

that by reason of the prior death of William Henry Bond, this legacy, at the time of the testator's death, constituted the only disposing part of the will, could not oust the probate court of the power, conferred upon it by the section in question, to determine the single question, which had been raised by the appellants' petition, as to the construction of that legacy only.

The appellees further contend that both the probate court and the superior court were without jurisdiction to grant the appellants' petition, because the latter were not parties having an interest in the construction of the legacy here involved. But it is clear to us that the appellants, as the next of kin of the testator, have a vital interest in the question whether or not the final clause of his will disposed of all his personal property.

We therefore are of the opinion that both the probate court, in the first place, and the superior court, on appeal, had jurisdiction to decide the questions propounded in the appellants' petition. We therefore find, on this ground, that the appellees' first exception should be overruled.

Having so found, we need not, and do not, rule upon the above-stated contention of the appellants that this exception should be overruled because the question of the jurisdiction of the probate court over the subject-matter had been decided against them, by the first justice of the superior court before whom the case came, and they had taken no exception to that decision.

The same reasoning and conclusion apply to their second exception, which is to the refusal of the superior court justice, at the trial of the case on its merits, to grant a similar motion to dismiss the appellants' appeal, for want of jurisdiction over the subject-matter.

The appellees' third exception is to the refusal of the trial justice in the superior court to permit them to introduce

at the trial a copy of a bill of complaint in equity which, it is alleged, the appellants had filed against the administratrix. This document was not marked for identification and preserved for our scrutiny, and there is nothing to show that by the filing of such bill the appellees were in any way estopped to file, in the proceedings in the probate court, their petition for the construction of the legacy here involved. We therefore find no merit in this exception.

The appellees' fourth exception is to the ruling of the trial justice that in the hearing on the appellants' appeal the superior court had jurisdiction to construe the will. This exception raised the same primary question as was raised by the second exception, and we therefore find no merit in it.

The fifth exception, to the final decision in the superior court, presents the main substantial question in the case, namely, whether the trial justice was correct in his construction of the final legacy in the will, namely, that the testator's bank accounts in Rhode Island were not disposed of thereby, a construction from which the result must follow that his next of kin, who, it is agreed, were the appellants, would be entitled to these accounts as his intestate property.

It is admitted by all the parties that because the testator was domiciled in England at the time of his death, the will must be construed, as to the personal property belonging to him at the time of his death, according to the law of England, although authorities in this country may properly be given some consideration, since the common law of both countries is presumed to be the same in the absence of a showing to the contrary.

The decision of the case on its merits must depend largely, if not entirely, on the construction to be given to the words "personal effects" in this final legacy, when construed in the light of the other language in the will and the proven pertinent facts of the case. In the first part of the will, after the introductory clause and the printed clause by which the

testator revokes all wills made by him at any time theretofore, the testator appoints as his executors his cousins Mary Agnes Almond and William Henry Bond, giving their addresses, and directs the payment of his debts and funeral expenses.

Then comes the following paragraph, which contains the language to be construed in this case, all of the paragraph being in the handwriting of the testator, except the first five words, which are printed: "I give and bequeath unto William Henry Bond 21 Rhyl Street Fleetwood the sum of twenty pounds. All the remainder of my personal effects including all money on deposit in Banks in England to be devided equally between my three cousins", naming then the three Almond sisters, one of whom was Mary Agnes Almond, and giving their address as the same as his own.

William Henry Bond, who lived in the same county as the testator, predeceased the latter. At the time when the will was executed, December 21, 1931, and until the death of the testator, on November 20, 1935 in Blackpool, he resided with the Almond sisters in a house belonging to them in that town. Mary Agnes Almond was duly appointed as executrix by the proper English court of probate and duly qualified and has acted as such.

In case of ambiguity as to the construction of language used in a will, evidence of circumstances surrounding the testator and existing at the time of the execution of the will may be considered as an aid in ascertaining his intention as therein expressed. *Meegan* v. *Brennan,* 63 R. I. 298, 7 A. 2d. 663, and cases cited. In our judgment such evidence should be considered in construing the language of this legacy. The facts which are proved by the evidence in the instant case and which may be pertinent in the construction of this language are as follows.

About sixty years ago the parents of the testator emigrated from England to the United States and settled, with

their children, in the Blackstone Valley in this state. When the testator was a little over ten years old he went to work in a textile mill in this state and was continuously employed in the textile industry here for about fifty years, rising to the position of assistant superintendent in one of the large mills. After occupying that position for about fifteen years, and having accumulated a moderate fortune, he retired from business in 1924 or 1925.

He never married and for some time before and then after his parents' deaths he lived with his brother Frederick. Part of the time he provided a home for another brother, John, who was a cripple. Later this latter brother went to the home of the above-mentioned Almond sisters, who never married and who lived together in Valley Falls in this state. The testator was quite friendly with them; and visited their home frequently while his brother John was living there. He was also very friendly with all his brothers and sisters, all of whom lived in this country; and when he was separated from any of them, he kept up a rather active correspondence with them.

In 1926 he made a journey to his childhood's home in Lancashire, England; and after being there for about two years, he decided to make it his permanent home. He then returned to this country and closed up his affairs here, except that he left the two savings accounts, above mentioned, in the Pawtucket banks. Then, after a stay here of about two months, he went back again to Lancashire, in which he thereafter, until his death, resided in Blackpool, with his Almond cousins. There is conflicting testimony as to whether they went over with him in 1926 or in 1928. He also had with him his brother John until the latter's death in the fall of 1931.

Between 1928 and the time of his death in 1935, he kept up a brotherly and friendly correspondence with his brothers and sisters in this country. On July 22, 1935, just about

four months before his death and when his health was not very good, he sent to his brother Frederick in this state a very "chatty" and friendly letter, in which he, among other things, said: "I drew all my money out, when I was over there in 1928 and placed in the Industrial and Hospital Trust Co. banks in Pawtucket, so if anything should happen to me Bertha Railton who holds a good position in the Industrial Trust Bank will notify you, Tom, Mary Jane, and our Sis right away . . . I had a letter from our Sis this week, seems to (be) getting along alright, as you will notice by the little newspaper clipping I am sending you." The persons referred to are the testator's two brothers and two sisters, being the present appellants.

It is hard to understand why, if he intended by his will that on his death the money in his bank accounts in Pawtucket should go to his cousins in England, he should have given to one of his next of kin, obviously for the benefit of all four of them, this information as to these bank accounts and as to their being given prompt notice of his death.

At the date of the will there was on deposit to the credit of the testator $11,094.31 in the Slater Trust Company branch of the Industrial Trust Company and $8,125.03 in the Pawtucket branch of the Rhode Island Hospital Trust Company. Apparently there were then also substantial amounts in banks in England.

At the date of the above letter there was on deposit to his credit in the former of the two trust companies in this state $12,403.18 and in the latter of them $8996.44. But on November 7, 1935, there was drawn from the latter trust company, on his order of transfer to a bank in England, the sum of $5000.

The appellees' counsel argues vigorously that according to English law there is, in construing wills, a strong presumption against intestacy. But in one of the most recent cases

cited in his brief in this court, *Kirby-Smith* v. *Parnell*, (1903) 1 Ch. 483, the court, in an opinion by *Buckley, J.*, says, at page 489, as to the construction of the will then before the court: "The principles to be applied are these. First, I ought to read the whole of the will and from it ascertain the testator's intention. Secondly, in ascertaining the intention, I ought to a certain extent—we all know what the expression means—to lean against an intestacy, and not to presume that the testator meant to die intestate if, on the fair construction, there is reason for saying the contrary."

In a comparatively recent case cited by the appellants' counsel, *In re Edwards. Jones* v. *Jones*, (1906) 1 Ch. 570, the court, at page 574, says: "A testator may well intend to die intestate. When he makes a will he intends to die testate only so far as he has expressed himself in his will." In *Hall* v. *Warren*, 9 H. L. Cas. 420, 11 English Reprint, 791, (1861), the court said, in substance, that to disinherit an heir at law it is not enough to be satisfied that intestacy was not intended, for that may be said of most wills; and that the title of the heir at law does not depend upon probable intention, but there must be words clearly substituting some other person for him.

A frequently occurring case for the application of a presumption against such a construction of a will as will produce a partial intestacy is one in which there is a general residuary clause purporting to dispose of all the rest, residue and remainder of the testator's property and estate; but, in the statement of the particular ways in which he proceeds to dispose of it, there is language which is capable of two interpretations, equally reasonable in themselves, one of which will, and the other will not, lead to the result that the residue will be fully disposed of. In such a case the former result, if equally reasonable otherwise, should be adopted. The only American case on which the appellees' counsel seems es-

pecially to rely is precisely of this character. *Reimer's Estate, Ewing's Appeal,* 159 Pa. 212.

Such is not the case here, because, in the first part of the final disposing clause of the will, the testator does not purport to dispose of all the rest, residue and remainder of all his "property and estate" or even of all the remainder of his "personal property," but to dispose of "all the remainder of my *personal effects*", and the uncertainty is in the meaning of the words "personal effects", as used by the testator, words which have been given different meanings in different wills. (italics ours)

In this connection it should be kept in mind that the words in question are in the handwriting of the testator and there is nothing to indicate that he had any assistance or advice from anyone skilled in the law. It should also be kept in mind that nearly all his life, since early childhood, had been spent in the United States. For these reasons legal precedents, and especially English cases, are of minor importance in the construction of his language; and ordinary usage seems to us the better criterion.

The appellees' counsel has cited and discussed many cases in which the word "effects" has been construed; but apparently he has not discussed or even cited any case in which the expression "personal effects" has been construed, except the Pennsylvania case above mentioned. There have been some will cases in which an expression such as "all my real and personal effects" has been held to include all the testator's real and personal property; but we do not find such cases to be of any help to us in deciding the instant case. The words "personal effects" have been defined in Webster's New International Dictionary, (2d ed.) Unabridged 1935, 1828, as follows: "Effects of a personal character; esp., as used in wills, tariff laws, etc., such property especially appertaining to one's person. The term may be restricted by words of narrower import to things ejusdem generis, or where not

restricted, as in a residuary legacy, may include all articles not employed in one's business."

In this case we must construe these words in the light shed upon them by the words which follow immediately after them in the will, namely "including all money on deposit in Banks in England." "Including" is generally employed as a term of enlargement and not as one of militation or enumeration and, when used in a will, it implies that something else is given beyond what is covered by the general language which preceded it. 31 C. J. 395, § 3 C; *Johnson* v. *Monson*, 183 Cal. 149, 152, 190 P. 635, 636; *Heffner* v. *Ketchen*, 50 Idaho 435, 440, 296 P. 768, 770; *Jacksonville Terminal Co.* v. *Blanshard*, 7 Fla. 855, 858, 82 So. 300, 301.

We are of the opinion that in the will now before us the addition of the words just above quoted strongly negatives the broad construction of "personal effects" as being equivalent to "personal property." If the testator understood those words, as he used them, to have that broad meaning, we cannot see why he should have added the words beginning with "including". And, on the other hand, if he understood and used them in either of the narrower meanings, which we have above mentioned, and wished his bank accounts in this country, as well as those in England, to pass by his will, we cannot see any reason why he did not add to the words "in England" the words "and in the United States" or equivalent words.

The appellees' counsel argues that the withdrawal by the testator, just before the time of his death, of $5000 from one of his bank accounts in this country supports the contention that he intended that those accounts, as well as the accounts in English banks, should go to his legatees, the Almond cousins. This argument ignores the above-mentioned letter sent by the testator to his brother Frederick a little more than three months before this withdrawal; and it seems to us much more probable that, realizing that the bank ac-

counts here would on his death go to his brothers and sisters as intestate property and wishing to increase the amount which would go to these cousins and to diminish correspondingly the amount which would go to his brothers and sisters, he sought to accomplish this purpose by the transfer of the $5000 from one of the banks here to a bank in England.

We are of the opinion that the bequest in the will to the testator's cousins did not include the Rhode Island bank accounts, but that the right to them passed as intestate property to his next of kin. We need not decide whether the words "my personal effects", as used in the will, meant all *tangible* personal property of the testator or only such property as pertained to his person. This is so because we are not concerned in this case with any of the testator's personal property having its situs outside of this country and there is no evidence before us that he had any property in this country at the time of his death other than the two bank accounts. For the reasons above set forth, we are of the opinion that the appellees' fifth exception should be overruled.

Under the sixth exception, which is to the decision of the trial justice sustaining the appellants' appeal from the decree of the probate court, the appellees seem to try to urge a contention that the appellants' petition was filed too late for consideration, because it was not filed until after the administratrix *c.t.a.* had sent to the executrix in England most of the assets of the estate in this country. But the evidence shows that these assets were sent without any authority from the probate court and that the action of the administratrix in sending them was never approved by that court.

In sending them and afterwards including them in an account filed by her, she took the risk that the account might be disallowed. *Slaimen* v. *Curtis,* 56 R. I. 351, 353, 185 A. 684, 685. Under all the pertinent circumstances of this case;

we are of the opinion that the trial justice did not err in refusing to dismiss the appellants' appeal because they had not filed their petition sooner than they did. They had filed it when the estate was still pending in the probate court and no account by the administratrix had been allowed. This exception raises no other question which has not already been decided by us against the appellees and therefore it should be overruled.

All the appellees' exceptions are overruled and the case is remitted to the superior court for further proceedings.

CONDON, J., concurring in part and dissenting in part. I concur with the majority in overruling appellees' first exception, but for a different reason from that given in the majority opinion. Appellees' failure to except to the decision of the justice of the superior court, who overruled appellees' first motion to dismiss appellants' appeal from the decree of the probate court, rendered the question raised by that motion *res adjudicata*. The question could not again be raised in the superior court, and the trial justice who heard the appellees' second motion to dismiss, which was based on the same ground of lack of jurisdiction in the probate court to construe a legacy, was himself without jurisdiction to pass upon that question. He quite properly, therefore, held that the question was *res adjudicata*.

Appellees' exception to this ruling brings to this court for review only the narrow question whether the trial justice was in error in holding the question *res adjudicata* as to the case before him. The ruling of the trial justice is supported by the recent decision of this court in *Colaluca* v. *Firstenberg Bottlers' Supplies, Inc.,* 65 R. I. 378, 13 A. 2d. 378. The principle therein enunciated is applicable to a question of jurisdiction over the subject-matter as well as to a question of jurisdiction over the person. *The Church Suits,* 49 R. I. 270, 274. That is also the law as laid down recently by the

supreme court of the United States in *Stoll* v. *Gottlieb,* 305 U. S. 165.

Under the above view it is not necessary at this time to determine the question of jurisdiction of the probate court, under G. L. 1938, chap. 579, § 15, to construe a legacy. However, since the majority has undertaken to determine that question, I feel obliged to say that I do not concur fully in the conclusion which the majority has reached. I agree with that part of their opinion which holds that the legislature has conferred upon the probate court the power to construe a legacy, but I disagree with their view that any person interested in a will is authorized by § 15 to invoke such power.

It is my opinion that no such procedure was intended by the commission which drafted said section and recommended it for enactment into law. On the contrary, I think that the commission clearly indicated in its report to the legislature that it was recommending an amendment of the then-existing probate law, especially for the benefit and protection of an executor or administrator *c.t.a.* To accomplish this purpose they drafted what is now § 15, which made it possible for such executor or administrator, if he felt there was a necessity for determining "the identity of a legatee, or the construction or the payment and satisfaction of any legacy", to obtain the advice and direction of the probate court before paying such legacy. Under the circumstances in which said section became a part of the probate law of this state, I think the purpose which the commission had in mind is entitled to very great weight in arriving at a proper construction of the statute.

The Court and Practice Act of 1905 made far-reaching changes in the judicial system of this state and in our practice and procedure. Under the provisions of the probate law as it existed before the passage of that act, an executor or administrator *c.t.a.* was without substantial protection in

the payment of legacies or after the filing and approval of his final account, as the law did not provide for the discharge of the executor or administrator from further liability. A number of decisions of this court prior to 1905 had revolved about this lack of termination of the liability of executors and administrators and apparently it was a situation that cried out for a remedy which only the legislative department was competent to give. Accordingly, when the commission was appointed to revise the judicial system of the state, this deficiency in our probate law did not escape their attention. On the contrary, they gave it their expert consideration and proposed what they deemed a suitable remedy.

That they did not contemplate going farther than offering a remedy for the well-known lack existing in the law is at once evident, it seems to me, from the very language of their report referring to § 15. They say therein that this section "empowers Probate Courts to construe wills *so far as may be necessary* to *advise executors* and *administrators with the will annexed* with respect to the *payment* of legacies. This provision *enables executors* to close their accounts in the Probate Court, and the law further provides for the discharge of executors and administrators *so as to terminate their liability.*" (italics mine)

I think it is reasonable to conclude from the above-quoted language that the commission was recommending a method by which an executor or administrator *c.t.a.* could obtain the advice and direction of the probate court, and that it was not opening the door for *anyone* interested in the will to obtain a construction of a legacy in that court. Certainly nothing would be gained in point of time by making possible such a procedure, but rather the opposite.

Certification of a bill for construction of a will is available to anyone interested in a will. That remedy is surely more expeditious than the circuitous appeals inherent in the pro-

cedure approved by the majority opinion. The travel of the instant petition is a good illustration in proof of this statement. Of course, if the legislature had expressly conferred such a right on anyone interested in a will, this question would not have arisen. In that event, regardless of the wisdom of the amendment or its desirability from any point of view, we would be obliged to give effect to the already expressed legislative intent; but in the light of the circumstances under which § 15 became a part of the probate law, and in view of the omission which it seems to me it was so clearly designed to supply, as indicated by the report of the commission, it is not reasonable to imply from the language of said section that it was the intention of the legislature to confer upon anyone interested in a will the right to invoke this new remedy.

We come next to a consideration of the language of the will to determine whether or not the residuary legatees take all of the remainder of the testator's estate after the payment of the specific bequest of twenty pounds to William Henry Bond. The determination of this question turns on the legal meaning of the words "personal effects", the qualifying significance, if any, of the words immediately following: "including all money on deposit in Banks in England", and also whether the rule of construction which leans against intestacy is applicable as an aid to a proper construction of the present will.

It is admitted that this will is to be construed according to the law of England. This being so, it is to the English decisions we must look for a proper understanding of the meaning of the words "personal effects". Definitions from dictionaries, either English or American, are without persuasive force if the courts of England have determined the meaning and scope of such words when used by a testator to dispose of his property. The following cases are convincing in this respect and quite clearly hold that the word "effects"

is synonymous with worldly substance or all of a man's property provided that there is no other language in the will which restricts the meaning of the word. *Hogan Lessee* v. *Rowland Jackson,* Cowper's Rep. 1 & 2, 299; *Hodgson* v. *Jex,* 2 Ch. Div. 122; *Campbell* v. *Prescott,* 15 Ves. 500a; *Michell* v. *Michell* (1820), 5 Madd. 69; *Smyth* v. *Smith,* 8 Ch. Div. 561.

There appear to be other cases to the same general effect. Indeed, it can be safely said that the great weight of English authority seems to support the holding of Lord Mansfield in *Hogan Lessee* v. *Jackson, supra.* In that case the question was whether the testator's words *"all the* REMAINDER *and* RESIDUE *of* ALL *the* EFFECTS *both* REAL *and* PERSONAL, which I shall die possessed of" were sufficient to convey the testator's real as well as his personal estate. There was no controversy over whether it comprehended personalty. It was argued that "effects real" comprehended no more than chattels real. Lord Mansfield rejected that contention and held that the word *"effects is equivalent to worldly substance"* saying, at page 304, "I take *effects* to be synonymous to *worldly substance,* which means whatever can be turned to value; and, therefore, that real and personal effects mean all a man's property." In other words "effects real" comprehended real estate of the testator, "effects personal" his personal estate, and "effects both real and personal" all of his estate.

Applying this language to the instant case it is clear that the testator, when he used the words "personal effects", without coupling with them any additional words of a restrictive nature, employed a term which has a settled meaning in the law of England. It is argued, however, that the words "including all money on deposit in Banks in England" immediately following the words "personal effects" necessarily indicate that the testator did not use the words "personal effects" to denote his personal estate but rather merely moveables pertaining to his person, and that the added words

are and must be considered as words of enlargement to include money on deposit in banks in England. This argument, however, overlooks the fact that the testator used the words "personal effects" immediately after making a specific bequest of twenty pounds to William Henry Bond and that he speaks of "All the *remainder* of my personal effects." (italics mine) At the very least this clearly indicates that he could not have used the words "personal effects" in the narrow sense claimed.

It is as reasonable to find that he was using the term in its broad sense, as settled by the law of England, as to infer that he was using it in its narrow sense; and I think it even more reasonable, especially in view of the important fact that, if the narrower sense was intended, then the testator must be held to have died intestate as to his personal estate in the United States. Where two constructions may be reasonably made of a testator's will, one of which leads to a partial intestacy and the other does not, the latter construction will be adopted; and the reason is that the law leans strongly against intestacy where the testator has solemnly undertaken to dispose of his property by will, unless his intention to die intestate as to part of his property is clearly manifest in the instrument itself.

Moreover, it has been said that this abhorrence of intestacy under a will is strongly manifested by the courts especially where the subject of the gift is the residuary estate. 28 R. C. L. § 189, p. 228. This rule of construction is uniformly adhered to by the courts of England and was characterized by Lord Esher, M. R. in *In re Harrison. Turner* v. *Hellard* (1885), L. R. Div. 30 Ch. 390, 393 as a "golden rule". It is also the rule which has been consistently referred to and followed in this state. *Industrial Trust Co.* v. *Gardner,* 44 R. I. 404; *Hammill* v. *Anderson,* 43 R. I. 103; *Cook* v. *Cook,* 35 R. I. 342; *Smith* v. *Greene,* 19 R. I. 558.

Looking at this will and searching first of all for the intention of the testator, I find it impossible, in the face of

the well-recognized rules of construction above discussed and the lack of any manifest indication in the will itself, to hold that the testator intended to die intestate as to any of his property. Therefore, notwithstanding the testator's inexplainable interpolation of the words "including all money on deposit in Banks in England", after his gift of all the remainder of his personal effects, I find that he has given all his personal property to his residuary legatees.

PER CURIAM. We have read and considered the appellees' motion for a reargument. We do not find that they have therein called our attention to any pertinent fact or consideration or argument which we have overlooked or misunderstood, or to any error or inconsistency in our reasoning or conclusions.

We see no sufficient reason for a reargument of this case, which was well and thoroughly argued by the attorneys on both sides, in written briefs and orally, when the matter was heard before us upon the appellees' bill of exceptions.

The motion for a reargument is therefore denied.

*William S. Flynn, Stephen A. Fanning, Christopher J. Brennan,* for appellants.

*Joseph T. Witherow,* for appellees.